Bradley, J.
The subject of the controversy in this action is the alleged right of the parties to use the water of the Genesee river for hydraulic purposes at the city of Rochester, through which the river runs in a northerly course.
At quite an early day its waters at' the Genesee Falls were to some extent appropriated to propel machinery, and mills have been erected and operated by such power on either side of the river. At the place in question, prior tp 1835, the water was for that purpose diverted into raceways by means of wing dams. In that, or the following year, a dam was constructed across' the river to furnish such supply.
The plaintiffs allege and claim that the use of all the water supplied by this dam belongs to the west side of the river, except six eighty-fifth parts, each part representing one run of stone; that is to say, that the entire water is represented by eighty-five parts, of which the raceway on the west side; known as Brown’s race, is entitled to seventy-nine parts, to be used to operate the mills there. And because the defendants are taking into their race on the east side more than six of such parts, this action is brought to so restrain them as to restrict their use to such quantity.
The width of the river at the dam is 293 feet, and the title to the lands on the respective sides extends to the thread of the stream, and except as modified by some agreement or grant, the riparian owners are entitled to the use of the water as appurtenant to the land on the respective sides of the river. The burthen is, therefore, with the plaintiffs in support of their proposition to prove that the right to the use of the water has ceased to be connected with or appurtenant to, and has been severed from, the premises on the east side, or that those on the west side have acquired such rights of property on the east side as to deny to those on the latter the right to treat the use of the water as appurtenant to it, and thus afford to the occupants of the Brown race such alleged superior usufruct of the water.
It appears that in 1819 all the land in question on the east side of the river was owned by one Atwater, who that year conveyed to one Cleveland and others a piece of land near the falls, upon which a flour mill had been erected. This *391 conveyance was by metes and bounds, and although it extended at one point to or near the river, no water rights were conveyed other than the right to take water from a race or flume, and which the grantor by covenant undertook to supply sufficiently to run the mill.
At this time Atwater’s lands had not been divided into or designated by lots; but the next year he had it surveyed, and cut up into lots, and distinguished them by numbers. And the lot conveyed to Cleveland took 16 as its number. The lot next north of this was 15, which extended north to the brink of the falls, and that south of 16 was 17, and south of the latter was 18? which then being a long narrow lot extending south considerable distance along the river, was afterwards subdivided into lots A, 18, B, C, D, E, F, G, H, I, J, K, O, P, and in that order proceeding from north to south. They were all water lots. Atwater had a saw-mill on lot 17, which he operated by water brought on to the lot by means of a race or flume, which extended through lot 16 and supplied the water to run the Cleveland flour-mill, and in his deed to Cleveland and others he reserved the right to cut a canal through the lot and supply the requisite water to the flour-mill by that means instead of thé then existing race.
In 1821, Atwater conveyed lots 17 and B (with some other lots not important for the purposes of this action), to one Shearman. And in 1827 he conveyed all the rest of his land on the east side of the river to one Bissell, who, the same year conveyed an undivided half of it to -one Hills, and in 1832, the other undivided half to one Ely.
The race-way on the west side of the river, known as Brown’s race, was constructed extending from a point just above the location of the present dam, northerly and* for distance past the falls, and by it the structures and machinery on the bank were supplied with water taken into it by means of a wing dam.
On the 1st day of March, 1833, Silas 0. Smith and several other parties interested in the Brown race property, and one Reynolds, who had become the owner of lot 16, entered into an agreement in which it was recited that all the parties to it, other than Reynolds, owned and possessed hyhrauhc privileges on Brown’s race, and proceeded to state their respective rights between themselves to use the water of the race for operation of machinery, that there were other owners of such privileges on the race; that the parties to the agreement had agreed to purchase of Ely the undivided half of the property on the east side of the river which had been conveyed to him by Bissell; that such purchase was for the purpose of preventing, so far as they could, by owning such one-half of the land, the erection of hydraulic works or machinery *392 upon it, “and thereby reserving to themselves the privilege and advantage of said river which might otherwise be applied to said hydraulic works and machinery, and which is to be considered as surplus water to be enjoyed by the-parties hereto in proportion to their respective rights and privileges or their several water powers before mentioned,, and also for the further intent of keeping up the dam across the said river by which they now or hereafter may enjoy, or make use of their several privileges, or of erecting a, new dam on said piece or parcel of land, and to be continued to the west side of the said river,” and that Ely in pursuance of such agreement, and for carrying into effect such intent and purposes had on that day conveyed the land to Erastus T. Smith, Warharn Whitney and Edmund Lyon.
It was, therefore, agreed that the parties to the agreement should be entitled to use such surplus water to propel the machinery which they then possessed, or should thereafter possess, on the Brown race, in proportion to their several rights. And in case it should thereafter become-necessary to prevent such surplus being drawn off or used to propel other machinery than such as was then or might, thereafter be owned by the parties, and so declared by the vote of a majority of them, they shall be at liberty to erect saw-mills or other machinery on such land for the purpose of securing such surplus water and of preventing; the use of it by others, and that the benefit arising therefrom shall be for the joint benefit of all the parties to such agreement in proportion to their respective rights before-mentioned, and they shall severally pay the expense of erecting such saw-mills or other machinery provided, however, that no one who shall refuse his-assent to such erection shall be hable to pay any part of the expense of them and shall not receive any part of the profits arising therefrom. That if, at any time, the purchase and expected benefits therefrom shall not answer the objects and intention of the parties, a majority of them may direct a sale of the land, and it shall be sold and the proceeds divided amongst them; that the right to keep up the dam or to erect a new one shall not be affected by such sale, and that any conveyance which may be given shall expressly reserve such right; that any person then owning, or who should thereafter own, any water privilege on the Brown race, desirous-of participating in the benefits of the agreement, might do so by becoming a party to it in the manner specified and paying his share of the consideration of the purchase, and thereupon he should be entitled to the rights and privileges and be subject to the provisions of the agreement in proportion to the rights and privileges and be subject to the pro *393 visions of the agreement in proportion to his right; that the designation mentioned of the several rights of the parties to the quantity of water each is entitled to and the reference to the number of stones as the measure thereof are intended only as a means of ascertaining their respective rights to the said land and privileges resulting from the purchase thereof, and their respective proportion of the said consideration money.” And it was expressly declared that nothing contained in the agreement should alter or impair any vested right which any of the parties had to any water privileges or any other right which any of them had immediately before signing it. And that the deed was taken by Smith, Whitney and Lyon from Ely, and the title of it held in trust for the uses and purposes of the agreement. Those grantees were parties to the agreement, and the trial court found that Everard Peck, having become the owner of the undivided half of the premises which had been conveyed to Hills, did, in the year 1835. enter into an agreement with Silas O. Smith and others by which he sold to them such undivided half for the same uses and purposes as mentioned in the said agreement of March 1, 1833. This agreement of 1835 does not appear in the case, and there is no evidence of it other than in the recitals of deeds of conveyance subsequently made. And it is evident that at the time it was made Peck did not have the legal title, as the conveyance by Hills was made to him in 1838, but it is alleged in the complaint that he had the equitable title in 1835, and the recitals in that respect furnish no evidence of any other title as of that time in view of what appears. At the time the agreement of 1833 was made the parties to it evidently had in view the erection of a dam across the river, which was accomplished by them in 1836, and the dam then constructed still remains, and by it the races on both sides of the river have been supplied with water.
The lots B. 17, 15 and 16, were not embraced in the premises covered by the agreements of 1833 and 1835. They had been conveyed by deed to Atwater before his deed to Bissefl. But Cornelius Parsons having become the owner of lot 17, conveyed it with all the rights appurtenant to it to the owners of lots and water privileges on Brown’s race June 22, 1855. The object of the purchase as expressed in this deed was, so far. as practicable, to increase the flow of water into Brown’s race by turning therein, in times of low water, that which otherwise the owner of the saw-mill on the lot would have the right to use in propelling machinery there. And the grantees covenanted with each other that neither of them would sell his interest in the premises conveyed by the deed, except to his successor *394 in the ownership of the water lot and water rights then owned by him on Brown’s race, without the consent of the owners of two-thirds of the seventy-nine shares into which the water rights were divided, ‘ ‘ it being the intention of the parties that the ownership of a share in the premises, conveyed by the deed, shall be connected" and annexed, so far as practicable, to the ownership of a like share in, the water of said Brown’s race.”
It may be observed that the water rights in that race had been divided into seventy-nine parts, each part representing one run of stones, and this was mentioned in that deed. The rights of the respective parties were there stated which governed their several interests as tenants in common in lot No 17, conveyed by it. And the shares in the undivided half conveyed by Ely were represented in number by sixty-two, and those of the other undivided half in riumber by sixty-eight, as appears by deeds subsequently made of portions of those interests, to which reference may to some extent be hereafter made. The title to lots B, E, F, <3-, H, I, J, K, O, P, 13 and 16, on the east side of the river, became vested in William H. Ward and Joseph B. Ward. And afterwards, on the 5th day of October, 1866, the then owners of the lots and of the water privileges on Brown’s race, as parties of the first part, entered into an agreement with William H. Ward, as party of the second part, which recited that the parties of the first part were owners of the water lots and water rights and privileges, upon and connected with Brown’s race, on the west side of the river, and that they were owners as tenants in common of lot No. 17, on the east side, and the water rights connected with it, that the party of the second part was the owner of the lots on the east side of the river known as B, E. F. Gr. H. I. J. K.. 0. P, 13 and 16, that there had been some disagreement between the parties in regard to the precise extent of their respective rights in and to the use of the waters of the river adjacent to, and connected with, their several water lots, and that the interests of the parties of the first part, in and to the water of the river, had been, by decree of the supreme court of date May 25, 1854, fixed at seventy-nine parts, each part representing one run of stone, and adjusted as between them according to their respective rights and interests in Brown’s race, “ Therefore, for the purpose of apportioning the interests of the parties of the first and second parts in and to the waters of said river, and fully and finally settling and adjusting all disputes and controversy in respect thereto,” it was agreed :
1. That all the water and water-rights of the said river appertaining to or connected with the lots and premises hereinabove mentioned and referred to shall be divided into *395 and represented by eighty-five equal shares or parts, of which the parties of the first part shall be and are entitled to “ seventy-nine shares or parts, and the party of the second part to six shares or parts;” that the said water-rights and privileges shall be held and used by the several owners of the premises referred to in common in such proportions that such division and allotment of the water and water-rights in the manner and proportion therein stated represented the full amount of waters of the river, to which they and the premises by them severally owned “as above stated ” were respectively entitled, and that they released and conveyed each to the other so much of said water, water-rights and privileges as in and by the agreement and division they were not entitled to claim.
2. That the party of the second part might pass a shaft or shafts for the use of his buildings over or through lot IT, with the right to enter upon it for the purpose of altering and repairing the shaft.
3. That the parties of the first part are relieved from the duty of maintaining walls or guard-gates on the east side of the river.
4. That if the party of the second part should, within five years, require or elect to take a greater quantity of water than that allotted to him, the parties of the first part would sell him additional water rights to the extent of four from the seventy-nine parts, “with the right to transfer the same to the east side of the river for his use.”
5. That the covenants shall bind the heirs, representatives and assigns of the parties. .
6. That it is “covenanted, understood and agreed that nothing in this instrument contained shall impair, alter or in any way affect the rights and interests of the said parties of the first part as between themselves as heretofore established or now existing.”
The agreements of 1833 and 1835, before mentioned, embraced within their provisions all the lots on the east side of the river requiring consideration, except lots B, 15, 16 and IT, and those other than 15 are embraced within the provisions of the agreement of 1866. Lot No. 15, having been substantially washed away, is not deemed important for the purposes of this action. It is contended by the plaintiff’s counsel that those agreements consummated by that of October 5, 1866, establish their right to the use of all the water of the river above the dam for the purposes of Brown’s races, and to propel their machinery there operated by it, except six eighty-fifth parts apportioned to Ward by the last mentioned agreement, and that the defendant, James M. Whitney, is estopped from asserting in his behalf any claim to the contrary.
*396 This charge of estoppel is based upon the fact that the-defendant, Whitney, was one of the parties grantee to the deed of June 22, 1885, made by Parsons to Williams and others before mentioned; also a party to the agreement of 1886; also by decree of October, 1871, in an action for the-partition of lot 17, in which Joseph H. Pool was the plaintiff and the other owners of the lots and water-rights on Brown’s race, including Whitney, were defendants ; and by the deed made to him by the referee pursuant to such decree of date October 27, 1871. And that he is estopped as to some of the plaintiffs by deeds of Silas 0. Smith to-Eben N. Buel of November 10, 1851, and Buel to him of February 14, 1862; and reference is also made to a deed of date February 7, 1874, made by the executors of Silas 0. Smith to the defendant, Whitney, covering some property on the east side of the river. -
The decree declared that the lot 17 was represented by seventy-nine shares, and defined those of the several parties-in proportion to their interests in the water rights of Brown’s race, and it was adjudged that “the water rights and privileges which belonged or appertained to said lot or parcel of land when the same was conveyed by Cornelius Parsons on the 22d day of June, 1855, as set forth in the complaint, have been forever rightfully diverted into Brown’s race for the. benefit of the mill owners, or owners 'of water lots on said race, and that said water and privileges so diverted no-longer belong or appertain to said lot or parcel of land,”' and a sale was directed by a referee who made it and executed a deed to the purchaser who was the defendant Whitney.
The deed of Silas 0. Smith to Eben N. Buel recites the-purchase by the party of the first part and his associates of the undivided half of certain premises on the east side of the river conveyed by Ely, and the agreement of March 1, 1833, before mentioned, also that the “party of the first part and certain of his assoociates and others afterwards made a purchase of the other undivided half of the said lands for the same purposes, of Everard Peck, who now holds the title thereto, with the understanding and agreement on his part that he will convey the same to such person as the purchaser thereof shall direct;” that the party of' the first part owned eleven shares of the sixty-two shares-of the undivided half first mentioned, and eleven of the-sixty-eight shares of the other undivided half, which he-conveyed by this deed subject to the agreement of March 1, 1833. And by the deed it is further provided that nothing contained in it shall in any way affect the rights and privileges secured by that agreement, or in any way defeat-any of its provisions, or be held or taken 'in violation of *397 them on the part of the party of the first part. And the party of the second part covenanted “that no part of the waters of the river which any part of the land conveyed is entitled to, shall ever be used for hydraulic purposes on the aforesaid lands, or any part thereof, which is now or may hereafter be owned by him.”
The deed from Buel to the defendant Whitney conveyed the same property and contained substantially the same provisions as that of Smith to Buel. It is not claimed that all the plaintiffs were privy in estate with Smith, but that as to some and those of them to whom title to property on Brown’s race was deduced from Smith the defendant Whitney is estopped by the deed through Buel to him. And for that purpose reference is made to a conveyance by Silas 0. Smith of property on Brown’s race to Hiram Smith in June, 1816, and from him title to portions of it is deduced to the two plaintiffs Davis and the plaintiff Hinds, audio another deed of Brown’s race property made by Silas 0. Smith in 1836, to which through mesne conveyances title was taken by the defendants Whitney and Wilson. Th§ deed of Smith’s executors to Whitney contained an exception and reservation of all right which the testator had at the time of his death to the use of water originally belonging to land on the east side of the river, “ but transferred and made appurtenant to land on the west side without any prejudice to any rights which the said Whitney ” then had.
This deed was made after the deed by Parsons, before-mentioned, after the agreement of October, 1866, and after the decree of 1871. And while no such right or transfer is affirmed by the use of this provision it tends to show something of the purpose, as the executors understood it of the testator and of the parties who made the purchase and agreement of March, 1833. And some of them (and especially Smith), as appears by deeds before referred to, sought by exception and reservation, and by covenant therein on the part of the grantees, so far as related to the interests so conveyed, to exclude the right to the water on the east side of the river for hydraulic purposes with a view •evidently to the benefit and advantage of the owners of the race property, on the west side, where mills were located.
Those provisions in the deeds containing them were in effect matters of description of the property conveyed, by which it appeared that the right to the use of the water on the east side was not embraced in the grant. The proposition upon which the support of the plaintiffs’ contention must mainly depend, is that the right to the use of the water of the river east of its centre became appurtenant to .and part of the property of Brown’s race, and passed by) *398 grant- to the latter, and thus was vested such right in the plaintiffs and defendants, who are the owners of that race property.
The fact that some of the owners, more or less, of the property and water privileges on Brown's race became and were the owners of the land on the opposite side of the' river did not have the effect to make the right to the use of the water east of the thread of the stream appurtenant to their land on the west side, nor would such be the effect of a conveyance of the land on the east side by an owner of it on both sides, excepting and reserving from the grant-the right to the use of the water of the river.
To illustrate: Suppose A owned a section of land on both and opposite sides of a river, and he conveyed to B the land on one side by deed containing such exception and reservation. The right so excepted and reserved would not pass to the grantee, and A would have the right to divert to his-use on the side retained by him all the water of the stream;, but his subsequent conveyance of the land so • retained or any portion of it, with its appurtenances, bounded on the river would extend to its thread and no farther, and would not include the right to the use of the water beyond that line. Such reservation would be no more effectual to, render the right reserved appurtenant to that retained than would the reservation of any other portion of the first conveyance. He could yet transfer such right to his first-grantee or other riparian owner, or repurchase the land, first conveyed, and thus resume the use which the right reserved would give him.
So far, therefore, as the right of the plaintiffs to the use of the water of the east half of the river is dependent upon the former ownership by their predecessors in title on Brown’s race of the land-and water rights on both sides, or upon the conveyance of certain undivided interests on the east side, merely excepting and reserving such right from the operation of the deeds, the claim to such right so far as-relates to the water of the east portion of the river is not-supported. And in respect to recitals in a deed, they may estop the parties to it and their privies from asserting to the contrary of them. But to have that effect the recitals-must be of a particular thing or fact as in existence, and essential in character as relating to the subject of the grant. The estoppel is not by them extended to matters collateral to the grant or things embraced in general statements, and not in specific and well-defined terms. 1 Greenl. on Evi., § 26; Denn v. Cornell, 3 Johns. Cas., 174; Hall v. Benner, 1 Penn. Rep., 402; S. C., 21 Am. Dec., 394; Van Hoesen v. Holley, 9 Wend., 209; Demeyer v. Legg, 18 Barb., 14.
The deed of Buel to the defendant, Whitney, conveyed *399 an interest in the land on the east side of the river'only. And it is not seen how any privity in estate arose as between the grantee of that conveyance and Smith’s grantee and those holding through or under him of an interest in the Brown race property and its water privileges, unless it may be said that the right to the use of the water of the river east of the centre had become appurtenant to and connected as property with that on Brown’s race. This depends upon the construction and effect of the agreement of March 1, 1883, to which reference will be made hereafter, and which does not require consideration at this point as the Buel deed by its terms excluded the right to the use of the water from the grant made by it. The decree in the Pool action had relation to lot 17, only, which was conveyed by the referee’s deed to the defendant Whitney. He acquired by this deed no water rights as appurtenant to the lot for hydraulic purposes. If however, any question remained in that respect it was disposed of by the agreement of 1866. And the same may be said of the deed from Parsons to Williams and others to which the defendant Whitney, was one of the grantees. This deed conveyed lot 17 only, and defined the interests of the grantees respectively in it. The force of the estoppel whatever it was, resulting from those deeds operated upon the defendant Whitney, as grantee, and those who may claim under him as against the grantor and his assigns so far as relates to the property conveyed by them and the restrictions applied to it by the conveyances. But they were not in the way of his acquiring other lots and interests in the property on the east side of the river and asserting water privileges appurtenant. Doe v. Shelton, 3 A. & E., 265.
The inquiry arises whether the defendant Whitney, had any rights as owner of premises or any interest in them on the east side, to use any of the water of the river there at the time the agreement of 1866 was made and what was its effect upon such existing rights. And whether he was disabled from holding or thereafter acquiring any such right on that side by that agreement, supported so far as it was by those of 1833, and 1835. The lots below the dam and the only ones which could take any benefit from the dam and the race on the east side were 16, 17, A., 18, B. 0. and D. The only right which 16, had to water from the river was furnished by the covenant before mentioned, and that lot with 17, and B, were embraced in the provisions of the agreement of October 1866.
The trial court found that at the time of making such agreement the defendant was the owner of certain rights on Brown’s race and was in possession of, claiming title to certain water lots and privileges upon the race on the east *400 side of the river, and was then using a portion of the water of such race to run mills and machinery, which had been erected by him thereon. This finding was supported by the evidence, and it appears that John F Bush, (a party to the agreement of March 1, 1833), conveyed to defendant Whitney, by deed of date September 16, 1865, his interest in the lands in question and in that agreement.
That by deed of date May 1, 1851, John Williams conveyed to the defendant James Whitney all the interest Warham Whitney had at the time of his death on the east side of the river in both the Ely and Peck purchases, which was represented by 22-62 of the former and 22-68 of the latter." This-deed recites the purchases and the agreement of 1833, by reference to its record, and adds that Peck “now holds the title” to the undivided half conveyed to him, with the understanding and agreement that he will convey the same to such person or persons as the purchasers thereof shall direct, and makes the conveyance subject to,all the terms and conditions of the agreement of 1833, and to all the other terms, conditions and covenants to which Warham Whitney, his heirs or assigns, are or may be liable in reference to the said premises, ” and the party of the second part thereby agreed to keep and perform all the terms and covenants of Warham Whitney in such agreement. And that two of the three executors of the will of Peck made to him a deed of date November 1, 1865, purporting to convey all their interest as such in the premises on the east side of the river, and all the rights and privileges of their testator in the agreement of March 1, 1833, excepting and reserving any water rights or right of constructing a dam secured by it. Warham Whitney and Peck were parties to that agreement of 1833. By his will Peck empowered the three executors to convey lands, and devised all lands not conveyed by them to his heirs. The third executor was living at the time this deed was made, and it does not appear that it had his assent. We are inclined to think that this deed was ineffectual as a conveyance. Wilder v. Ranney, 95 N. Y., 7. It is unnecessary to refer to any other conveyances to the defendant prior to October 5, 1866, for the purposes of the questions here. There were other deeds of conveyance made to him after that time, amongst which was one from the heirs of Peck to the defendant of all the interest he had in the premises on the east side at the time of his death. And the evidence tends to prove that he had made no conveyance of the legal title to the undivided half conveyed to him by Hills of the premises, as before mentioned. The trial court found that before the commencement of the action the de-, fendant had become the legal owner of the premises which *401 had been conveyed by Bissell to Ely, and had acquired the interests of several persons (naming them) in the undivided half of the water privileges and in the contract of March 1, 1833, and had become the owner in fee of the legal title, which had been vested in Peck, in the other half of the premises by the deed of Hills to him, and had become the owner in fee of 44-68 of the interests which had been sold by Peck to Silas O. Smith and others, in 1835. It may be observed that all those whose interests are so found to have been acquired by the defendant Whitney in the undivided .half of the water privileges represented by the Ely purchase and in the contract of March 1, 1833, were parties to that contract, and represented a majority of the sixty-two :shares into which the interests were apportioned by such agreement. And none of the parties to that instrument are parties to this action, either personally or by their representatives. This finding in the main, and so far as is necessary for the purposes of this action, is supported by the evidence. The fact that the legal title to the Peck half was vested in the defendant Whitney must rest upon the deed made by his heirs of the title which they took by reason of the failure of the executors to convey within the meaning of the provisions before referred to of his will. Nearly thirty years had then elapsed since his death.
It may be that the parties beneficially interested in the purchase from Ely took the title by the conveyance because a trust was not created within the statute, and therefore. the grantees named in the deed took only the power to sell. 1 R. S., sec. 55; id, 729. Sections 58, 59.
But the question is not important here, and we therefore give it no consideration, nor is it necessary to attempt to demonstrate the correctness in all respects of the finding of facts last mentioned. The determination of the case must depend mainly upon the construction and effect of the agreements of 1833, 1835 and 1866. If, as contended by the plaintiff’s counsel, the right to the use of the water of the river which originally belonged to the riparian ownership of the land conveyed to Ely and Peck, was, by the agreements of 1833 and 1835, severed from the title of that, land, and transferred to and placed within the title, and made part of the water rights and privileges of Brown’s race, so as to become annexed and appurtenant to the riparian rights of the west side of the river for the purposes of that race, the plaintiff’s alleged claim in this action may be supported. The right to the use of the water of a stream is not a mere easement or appurtenance, but is annexed to the soil as part of the land, and like it may be granted and reserved. Wadsworth v. Tillotson, 15 Conn., 366; S. C. *402 39 Am. Dec., 391; Cary v. Daniels, 8 Met., 466; S. C. 41 Am. Dec., 532; Groat v. Moak, 94 N. Y., 118. Gould on Waters, sec. 304. The conveyances of the Ely half, and the agreements of the beneficiaries of it, did not have the. effect to produce such severance, transfer and connection,, nor did the purchase of the equitable interest of Peck contribute to or cause such result. The proprietorship of the land, and of the right to the use of the water, were in the same persons, and in the legal sense such right remained-attached to the soil east of the thread of the stream. So far as the ownership of the land permitted, the parties to-the agreement could prevent the use of the water on the east side, and divert an increased quantity into Brown’s', race, without prejudice to others, but that would not change the proprietary relation of the right to the use which it had to that of the bed over which it ran, and although the right of diversion existed in the title to both, the exercise of such right would have the effect to serve a purpose rather than to change its property relations to the soil. The purchases were evidently made, as appears by the agreement, to prevent so far as they could the erection of hydraulic works on the east side of the riv.er, and thus, take for themselves the advantages of the use of the water. This they could do by owning and controlling the east bank of the river They joined in the purchase for that purpose and contemplated that if necessary to do so to secure to-themselves the use of the surplus, and to prevent the use of it by others, they would erect machinery upon the east side. They also had in view the erection of a dam across the river, which they did erect, and for its preservation provided by the agreement of March 1, 1833, that it should not be affected by any sale of the property so purchased. As there was nothing in the agreement, or its effect which severed the right to the use of the water from its natural relations, and connected it with Brown’s race, so as-to make it appurtenant to the west side, it cannot be said that the successors in title to the Brown race property, and to the water privileges thereto belonging of those who then were the riparian owners on the west side, took by virtue-' of such succession by purchase any property in the right to the use of the water in the other side of the river.
And so far as we are able to ascertain from the record, it. does not appear that the plaintiffs have succeeded to any of the property interests on the east side of the river of the parties who made the purchases of Ely and Peck. These-views lead to the conclusion that no privity in estate appears to have existed between the grantees of the Brown race property, and privileges as such, and the grantees of the property so purchased on the east side of the river. *403 And it is therefore deemed unnecessary to refer to the deeds under which the defendant Whitney claims and the recitals for any purpose other than as evidence of the estate, its qualifications and limitations conveyed by them. We find nothing which precludes him from denying the alleged right of the plaintiffs to the use of the water of the east half of the river as appurtenant to Brown’s race, except so far as relates to the lots and water privileges of the east side embraced within the agreement of October 5, 1866, and so far as the situation and relation produced by that agreement may conclude him. The defendant Whitney was one of the parties of the first part to such agreement which was made between persons designated as the owners of water rights and privileges on Brown’s'race of the first part, William A. Ward of the second part, and John Williams of the third part. It was practically and for all purposes essential to this case, an agreement between the parties of the first and second parts. The parties of the first part represented the property and water rights and privileges on Brown’s race on the west side and lot No. IT, on the east side of the river, and Ward represented as owner lots B and No. 16 below the dam, and certain lots above the dam on the east side. The agreement was made to settle an existing disagreement between the parties of the first and second parts. There was no controversy between those of the first part. Their relative rights as between themselves had been fixed by decree of May, 1854, as appears by the agreement, and were as a whole represented by seventy-nine parts. They therefore had the relation of one party, and were in fact united as such in the agreement, and each person embraced in the parties of the first part was a constituent part of a single party to it. And the agreement related to the premises and the rights appurtenant to them therein mentioned, in which were not included lots A, 18, O and D, on the east side of the river below the dam. The recited disagreement related to “the use of the water of said river adjacent to or connected with their several water lots.” The parties did not by the terms of the instrument assume to apportion the use of the entire waters of the river, but “the waters of the river as aforesaid,” which had relation, or were adjacent or appurtenant to the described premises. They proceeded to apportion “the water and water rights of the river appertaining to or connected with the lots and premises” thereinbefore “mentioned or referred to ” into eighty-five parts, of which the parties of the first part should have seventy nine and the other party six. And the other provisions of the agreement are subordinate in that respect to such qualification.
If any further aid were needed in the construction and *404 effect of the contract and of the intention of the parties to it, reference may be had to the judgment of this court, rendered February, 1873, in an action brought by and in behalf of the owners of Brown’s race property against the Rochester Hydraulic Company (which had succeeded to the title of Ward, from whom • and others it had taken conveyance subject to the agreement of October 6, 1866,) to restrain it from taking and using water from the river in quantity greater than the six shares or parts.
The defendant Whitney and three others interested in Brown’s race property, not consenting to be joined as plaintiffs, were made parties defendant. The agreement in question was set out in the complaint in that action, which charged that the company had taken conveyance subject to it, and that in violation of its provisions was taking from the river a greater quantity than six parts. And, by the judgment granting the relief, it was, amongst other things, adjudged “that all the water and water rights of the Grenessee river, appertaining to or connected with the mill race on the west side of the river—known as Brown’s race and lots (naming the Ward lots)—also lot No. 17—on the east side of the river—shah be and are divided into and represented by eighty-five equal shares or parts of which the said plaintiffs and the defendants (who did not consent to join as plaintiffs) and their heirs and assigns shall be and are entitled to seventy-nine shares or parts, and the Rochester Hydraulic Company, its successors and assigns, to six shares or parts.” This seems to be a judicial construction of the agreement and of its scope and effect. And no reasonable opportunity appears to place lots A, 18 and C, on the east side, within its provisions. The sixth clause or paragraph of the agreement, providing that the rights and interests of the parties of the first part as between themselves, and as then existing, should not, in any way be impaired, altered or affected by it, may not in view of such construction and effect of the agreement have been important, but whatever rights thé defendant Whitney then had outside of these in common with his associates and embraced in its provisions, would seem to have been within its saving purpose. He has possession of lots C and D and of part of lots A and 18, and has some estate in them, the extent of which, for the purpose of this action, is not very important. Nor, in the view taken of the agreement of October, 1866, is it essential to inquire whether he acquired such title or interest before or after that that' agreement was made. Those lots afford water rights, and he is appropriating water from the river for hydraulic purposes by means of the race, which enters lot D and extends through it and lots C, B, 18 and 17 and discharges its water *405 into the river from lot No. 16. He also has possession of part of lots B and 17. The original defendant, Charles E. Upton, held under the Rochester Hydraulic Company and was subject to the provisions of the agreement of 1866. The defendant Pierpont has succeeded to his rights pendente lite.
The defendant Upton was not alone charged with the use of more than six parts, but the charge established by the evidence is that the defendants received, through the race on the east side, more than six eighty-fifths of the water of the river. The right in the defendant Whitney to the use of water connected with lots other than those within such agreement requires the conclusion that the plaintiffs are not entitled to the relief sought by them. We have examined the several exceptions taken to the findings and refusals to find and to the rulings on the trial, and think there was no error to the prejudice of the plaintiffs.
The judgment should be affirmed.
Smith, P. J., and Haight, J., concur.